IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | | |
|---|---|---|
| BRIAN K. SHIPLETT, | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 5:15-cv-00030 |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner, | ) | By:    Joel C. Hoppe |
| Social Security Administration, | ) | United States Magistrate Judge |
| Defendant. | ) | |

Plaintiff Brian K. Shiplett asks this Court to review the Commissioner of Social Security's ("Commissioner") final decision denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401–34, 1381–1383f. On appeal, Shiplett argues that the Administrative Law Judge ("ALJ") erred in weighing his credibility and evaluating the effects of his impairments on his ability to work. The case is before me by the parties' consent under 28 U.S.C. § 636(c)(1). ECF No. 6. Having considered the administrative record, the parties' briefs and oral arguments, and the applicable law, I find that substantial evidence supports the Commissioner's final decision.

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. *See* 42 U.S.C. § 405(g); *Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, the Court

1

asks only whether the ALJ applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (internal quotation marks omitted)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a). Social Security ALJs follow a five-step process to determine whether an applicant is disabled. The ALJ asks, in sequence, whether the applicant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461

2

U.S. 458, 460–62 (1983); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The applicant bears the burden of proof at steps one through four. *Hancock*, 667 F.3d at 472. At step five, the burden shifts to the agency to prove that the applicant is not disabled. *See id.*

## II. Procedural History

Shiplett filed for DIB and SSI on January 9, 2012. *See* Administrative Record ("R.") 86, ECF No. 10. He was 48 years old at the time he filed his claim, R. 86, and had worked as a construction laborer, R. 61. Shiplett alleged that he had been disabled since October 15, 2010, because of problems with his left ankle, left shoulder, right shoulder, and feet; high blood pressure; and high cholesterol. R. 86, 185, 189. Disability Determination Services ("DDS"), the state agency, denied his claim initially and on reconsideration. R. 104, 111. Shiplett appeared with counsel before ALJ R. Neely Owen for an administrative hearing on January 30, 2014. R. 55–85. Shiplett testified about his medical conditions and the limitations those conditions caused in his daily life activities. R. 64–72. A vocational expert ("VE") also testified about Shiplett's work experience and his ability to return to his past work or to perform other available work. R. 73–84.

The ALJ denied Shiplett's applications in a written decision dated February 27, 2014. R. 38–50. He found that Shiplett had severe impairments of osteoarthrosis and allied disorder and dysfunction-major joints. R. 43. These impairments, however, did not meet or equal a listing. R. 43–44. The ALJ next determined that Shiplett had the residual functional capacity ("RFC")[1] to perform "light work."[2] R. 44. He limited Shiplett to walking or standing for four hours and

---

[1] A claimant's RFC is the most he or she can do on a regular and continuing basis despite his or her impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a); SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996).

[2] "Light" work involves lifting no more than twenty pounds at a time, but frequently lifting objects weighing ten pounds. 20 C.F.R. §§ 404.1567(b), 416.967(b). A person who can meet these lifting requirements can perform light work only if he or she also can "do a good deal of walking or standing, or

sitting for six hours in an eight-hour workday, imposed a number of postural limitations, restricted Shiplett to frequently reaching overhead with his right arm, and precluded him from concentrated exposure to workplace hazards such as dangerous machinery or heights. *Id.* Relying on the VE's testimony, the ALJ concluded that Shiplett could not perform any of his past relevant work, but could perform other available jobs, including convenience store clerk, gate guard, and mail routing clerk. R. 49. The Appeals Council declined to review that decision, R. 1–4, and this appeal followed.

## III. Discussion

Shiplett argues that the ALJ erred in not fully crediting his descriptions of the limiting effects of his symptoms. Pl. Br. 5–9, ECF No. 2. Because I find that substantial evidence in the record supports the ALJ's determinations, I must disagree with Shiplett's arguments.

*A.    Relevant Facts*

Shiplett primarily alleges disability caused by chronic pain in his right shoulder, as well as ankle pain and muscle spasms resulting from past injuries and surgeries. R. 13–14, 62. He injured his ankle in 2001 after falling off a roof, severely fracturing his distal tibia and fibula, and he underwent four different surgeries. R. 278. Pain in his right shoulder was first noted prior to surgery for subacromial decompression, debridement of calcific tendinitis, and partial thickness rotator cuff tear in 2004. R. 343. In May 2008, Shiplett suffered an acromioclavicular ("AC") joint separation to his left shoulder in a motorcycle accident. R. 344. Kenneth A. Boatright, M.D., discussed treatment options, including reconstructive surgery, with Shiplett. *Id.* Shiplett opted to pursue conservative measures of using a sling and taking medications while he continued to work construction at reduced lifting levels. *Id.* His shoulder pain persisted, and in

do some pushing and pulling of arm or leg controls while sitting." *Hays v. Sullivan*, 907 F.2d 1453, 1455 n.1 (4th Cir. 1999).

4

July 2008, Dr. Boatright advised Shiplett to avoid work to allow his shoulder to heal. R. 344–45. Later that month Jack F. Otteni, M.D., discussed AC joint reconstructive surgery with Shiplett and scheduled him for surgery. R. 346. In August, Shiplett took time off from work. R. 347. Dr. Otteni examined his left shoulder and found that he had full range of motion, intact strength, and normal neurologic and vascular signs, although his AC joint had significant deformity. *Id.* Dr. Otteni encouraged Shiplett to remain off work for two weeks, and he opined that he likely would not require surgery in the future. *Id.*

On March 17, 2010, Shiplett reported pain in his right shoulder after experiencing syncope and falling on it. R. 299. An X-ray of his right shoulder revealed no fracture, dislocation, or other acute bony or soft tissue abnormality. R. 317. An X-ray of his left ankle on March 31, 2010, showed an old fracture with degenerative changes, but no acute fracture. R. 316.

On February 28, 2011, Shiplett saw his primary care physician, Robert G. Kennedy, M.D., for complaints of bilateral foot pain. R. 290. Dr. Kennedy noted swelling and well-healed surgical scars in his left ankle. He had a negative Tinel sign on the right ankle, but positive on the left. Shiplett also reported "some trouble" with his right shoulder. Dr. Kennedy noted that his shoulder had abduction to about ninety degrees limited by pain, a positive Hawkins sign, and pain with resisted external rotation. Dr. Kennedy diagnosed bilateral foot paresthesia with likely tarsal tunnel and a history of right shoulder acromioplasty now showing impingement symptoms. On June 16, 2011, Dr. Kennedy examined Shiplett for complaints of increased left ankle pain and noted joint line swelling and tenderness. R. 285. He found that Shiplett's arc of motion, flexion, and extension in his left ankle were less than fifteen degrees. Dr. Kennedy referred Shiplett to an orthopedic surgeon for evaluation of possible ankle fusion.

On July 7, 2011, Dr. Boatright and a physician's assistant examined Shiplett and obtained X-rays of his left ankle, which showed significant changes to the ankle fracture and severe arthritis. R. 278. They also noted numerous screws in his ankle, some of which had been clipped in an attempt to remove them. The following month, Shiplett reported to Ramon C. Esteban, M.D., that he was experiencing increased left ankle pain, which made his work in construction more difficult. R. 277. Physical examination revealed a "quite limited" range of motion, tenderness, and swelling in the left ankle. Reviewing X-rays, Dr. Esteban noted a significant bony deformity as well as joint space narrowing in the left ankle, likely indicative of severe ankle arthritis from his past trauma. He found that the tibiotalar joint was no longer congruent and that he had periarticular osteophytes, with the anterior ones being the largest. Dr. Esteban discussed two treatment options: a non-operative option of wearing a shoe with a metal brace, and an operative option involving fusion of the tibiotalar joint. Surgical risks included infection leading to amputation of the left lower extremity, and Dr. Esteban would require Shiplett to quit smoking for three months before he would perform the surgery. In December 2011, Shiplett complained to Dr. Kennedy that he experienced paresthesias, or burning sensation in his feet, but that Aleve relieved his symptoms. R. 282. Shiplett advised that he was reducing the number of cigarettes he smoked so that he could have surgery on his left ankle. Dr. Kennedy prescribed Gabapentin and hydrocodone and scheduled an EMG nerve conduction study. Results of the study conducted on January 24, 2012, were within normal limits with no clear evidence of focal or polyneuropathy affecting the lower extremities. R. 321–22.

On March 30, 2012, R. S. Kadian, M.D., reviewed Shiplett's medical records for the state agency and assessed his RFC. R. 86–94. Dr. Kadian determined that Shiplett could lift and carry twenty pounds occasionally and ten pounds frequently; sit for six hours and stand or walk for

four hours in an eight-hour workday; frequently balance and stoop; and occasionally crouch, crawl, and climb stairs, ramps, ladders, ropes, and scaffolds. R. 91. Dr. Kadian attributed these limitations to Shiplett's history of ankle surgery and foot paresthesia. *Id.* He also found that Shiplett was limited to frequently reaching overhead with his right arm because of pain. R. 92. Additionally, Shiplett should avoid concentrated exposure to hazards because of his syncope. *Id.*

On February 4, 2013, Shiplett's attorney requested that Dr. Kennedy provide his medical opinion of Shiplett's ability to work. R. 330–33. Enclosed with the letter was a form listing five questions about Shiplett's functioning and a document written by Shiplett detailing his activities in October and November 2012. R. 333–35. Shiplett wrote that for seven days in October, he engaged in general housework, fence repair, and household chores. For November, he reported painting fences for between two and a half to eight hours per day. Some of these days were consecutive, while others were not. For example, on November 6, 2012, he reported painting a fence for seven and a half hours, followed by only two and a half hours the next day. He was able to paint for eight hours each day on November 9, 12, and 14. *Id.* On the 15th, he raked leaves and operated an industrial vacuum for seven hours, and he painted a fence for an additional seven hours the following day. *Id.* Shiplett pursued these activities for thirteen days in November. As to Shiplett's functional abilities, Dr. Kennedy indicated that he did not believe Shiplett could perform light or medium work as defined by the Social Security Administration, but that he could perform sedentary work. R. 333. He also indicated that he did not believe Shiplett could complete a full work week when working eight hours per day, as his symptoms would limit his ability to complete a normal work day. *Id.*

In his disability paperwork and in his testimony before the ALJ, Shiplett explained that he could do some activities around the house by himself and that other tasks required assistance

from family members. Shiplett stated that he was able to take care of pets, prepare his own meals, wash dishes, do laundry, go grocery shopping, and use the riding lawnmower. R. 210–12. His wife helped with taking care of the pets and handling their finances. R. 212. He stated that he could no longer do outdoor activities, such as hiking or fishing. R. 214. Shiplett described his pain as aching, stabbing, and burning. R. 205. He claimed that the pain was constant and exacerbated by walking, standing, reaching, and lifting. *Id.* He stated that he could lift only ten to fifteen pounds and could walk only one-eighth of a mile before needing to rest. R. 214.

At the administrative hearing, Shiplett testified that his ankle pain causes muscle spasms that interfere with his sleep. R. 68. He was no longer able to operate a manual-transmission vehicle because pushing in the clutch caused pain when using his left ankle, but he was able to drive an automatic, although it irritated his shoulder. R. 69–70. Beginning in the summer of 2013 and continuing at least through January 30, 2014,[3] the date of the administrative hearing, Shiplett worked for a landscaping company. R. 65. In the summer, he worked full time, and in the fall, he was able to work approximately three days a week, but had to take a day off of work each week to recover from the pain to his shoulder caused by digging in hard ground. R. 65, 67. Some weeks Shiplett was assigned to spread mulch rather than dig, and he was able to work full time. R. 67.

B. *Analysis*

The regulations set out a two-step process for evaluating a claimant's allegation that he is disabled by symptoms, such as pain, caused by a medically determinable impairment. *Fisher v. Barnhart,* 181 F. App'x 359, 363 (4th Cir. 2006) (citing 20 C.F.R. § 404.1529). The ALJ must

---

[3] Treatment records submitted after the hearing report that Shiplett was working in landscaping in May 2014. R. 12–13.

first determine whether objective medical evidence[4] shows that the claimant has a medically determinable impairment that could reasonably be expected to cause the kind and degree of pain alleged. 20 C.F.R. §§ 404.1529(a), 416.929(a); *see also Craig,* 76 F.3d at 594. If the claimant clears this threshold, then the ALJ must evaluate the intensity and persistence of the claimant's pain to determine the extent to which it affects his physical or mental ability to work. SSR 96–7p, 1996 WL 374186, at *2 (July 2, 1996); *see also Craig,* 76 F.3d at 595.

The latter analysis often requires the ALJ to determine "the degree to which the [claimant's] statements can be believed and accepted as true." SSR 96–7p, 1996 WL 374186, at *2, *4. The ALJ cannot reject the claimant's subjective description of his pain "solely because the available objective medical evidence does not substantiate" that description. 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2). Rather, he must consider all the evidence in the record, including the claimant's other statements, his treatment history, any medical-source statements, and the objective medical evidence. 20 C.F.R. §§ 404.1529(c), 416.929(c). The ALJ must give specific reasons, supported by specific relevant evidence in the record, for the weight assigned to the claimant's statements. *Eggleston v. Colvin,* No. 4:12cv43, 2013 WL 5348274, at *4 (W.D. Va. Sept. 23, 2013) (citing SSR 96–7p, 1996 WL 374186, at *4). A reviewing court will defer to the ALJ's credibility finding except in those "exceptional" cases where the determination is unclear, unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all. *Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 68 (4th Cir. 2014) (citing *Edelco, Inc. v. NLRB,* 132 F.3d 1007, 1011 (4th Cir. 1997)); *see also Mascio v. Colvin,* 780 F.3d 632, 640 (4th Cir. 2015).

---

[4] Objective medical evidence is any "anatomical, physiological, or psychological abnormalities" that can be observed and medically evaluated apart from the claimant's statements and "anatomical, physiological, or psychological phenomena [that] can be shown by the use of medically acceptable diagnostic techniques." 20 C.F.R. §§ 404.1528(b)–(c), 416.928(b)–(c). "Symptoms" are the claimant's description of his or her impairment. *Id.* §§ 404.1528(a), 416.928(a).

9

The ALJ determined that Shiplett had medically determinable impairments of osteoarthritis and allied disorder, and dysfunction of major joints. R. 43. He found that these impairments could reasonably be expected to cause some of Shiplett's alleged symptoms, but that his statements concerning the intensity, persistence, and limiting effects of his impairments were not entirely credible.[5] R. 45. He offered two reasons to support this credibility assessment. First, he found Shiplett's treatment to be "relatively limited and conservative overall." R. 47. He noted that medication had been "relatively effective" in treating his pain and that Shiplett failed to quit smoking and pursue surgery as his doctors had suggested, which could be indicative of noncompliance. *Id.* Second, Shiplett engaged in daily activities "that are not consistent with allegations of total debility." *Id.*

Shiplett challenges the ALJ's conclusion that his course of treatment undermines his credibility as to the intensity of his pain. Pl. Br. 5. "An unexplained inconsistency between the claimant's characterization . . . of [his] condition and the treatment [he] sought to alleviate that condition" can bear heavily on the claimant's credibility. *Mickles v. Shalala*, 29 F.3d 918, 930 (4th Cir. 1994) (citing the current 20 C.F.R. § 416.929(c)(3)). During the relevant period Shiplett's treatment consisted primarily of pain medication, such as Aleve. Shiplett reported mixed results as to the effectiveness of the medication in relieving his pain. *Compare* R. 282 (expressing some pain relief from using Aleve), *with* R. 278 (noting that pain medication would be inadequate in treating his symptoms). Well before his alleged disability onset date, Shiplett underwent more invasive forms of treatment. He had surgery on his left ankle in 2001 and his right shoulder in 2004. He was evaluated for surgery on his left shoulder in 2008, but his AC joint separation resolved with rest and time off from work. In 2011, during the period relevant to his disability application, Shiplett was evaluated

---

[5] Shiplett correctly asserts that the ALJ's analysis is backward as he "should have compared [Shiplett's] alleged functional limitations from pain to the other evidence in the record, not to [his] residual functional capacity." *Mascio*, 780 F.3d at 639. This error was harmless, however, because the ALJ properly analyzed Shiplett's credibility elsewhere in his opinion. *See id.*

for left ankle fusion surgery, and Dr. Esteban recommended an orthopedic boot or fusion surgery, but Shiplett would have to quit smoking before he would perform the surgery. A medical history form that Shiplett submitted indicates that he received an orthopedic boot in July 2012, R. 228, but the Administrative Record does not contain this treatment record or other records from that time. The recommendation of surgery—an invasive form of treatment—demonstrates the seriousness of Shiplett's left ankle impairment. It also erodes the grounds for the ALJ's finding that Shiplett's treatment, or at least the treatment recommendation, of his ankle was solely conservative. Much of Shiplett's treatment during the relevant period for his shoulder problems could be viewed as conservative, but the recommended fusion surgery on his left ankle is not.

Shiplett challenges the ALJ's finding that he was noncompliant with treatment and thus his report of symptoms was less credible. "[N]oncompliance indicates a lack of credibility only where 'there are no good reasons' for failing to follow treatment." *Dunn v. Colvin*, 607 F. App'x 264, 275 (4th Cir. 2015) (citing SSR 96-7p, 1996 WL 374186, at *7). ALJ Owen cited Shiplett's failure to quit smoking and obtain recommended surgery as evidence of noncompliance. R. 47. Shiplett expressed to Dr. Kennedy some willingness to stop smoking and pursue surgery, although it appears he may have opted for the non-invasive option of an orthopedic boot. R. 228. The reason Shiplett did not undergo surgery was not fully developed in the evidence or the ALJ's analysis. The record does contain some evidence that Shiplett did not follow-up with his orthopedist, but the purpose of that follow-up, whether for surgery evaluation or some other treatment, is not provided. *See* R. 352.

Shiplett claims that his conservative treatment history was a result of his evaluation of the risks associated with surgery combined with his inability to pay for such procedures. R. 5–7. The ALJ did not acknowledge that there were substantial risks, such as infection leading to amputation, attendant to the recommended surgery on Shiplett's left ankle. R. 227. I can hardly fault the ALJ's omission, however, as nothing in the record shows that Shiplett avoided surgery out of concern for the associated risks. Shiplett points to his consultation with Dr. Otteni in 2008 in support of his claim

11

that he decided not to pursue surgery because of "the risks of surgical intervention . . . and the long convalescent period involved." Pl. Br. 7. He further faults the ALJ in making "no mention of the consultation with Dr. Otteni cited above, a significant part of the full record insofar as it deals with possible surgical treatment of Mr. Shiplett's primary impairment of shoulder pain." *Id.* at 8. This argument is misplaced. Although Shiplett identified his left shoulder problems as a reason for disability, his treatment records during the relevant period and his report of limitations focused on his right, not his left, shoulder, and Dr. Otteni evaluated Shiplett's left shoulder for surgery. Moreover, Shiplett's left shoulder problem, according to Dr. Otteni, was expected to resolve within weeks after he took a break from working such that surgery would not be necessary. Accordingly, the ALJ did not err in failing to consider Dr. Otteni's discussion of treatment for Shiplett's left shoulder.[6]

The ALJ dismissed Shiplett's claims of an inability to afford surgery, stating that it is "generally known" that free and discounted medical care is available for those that need it. R. 47. There is nothing in the record to support this conclusion, however. In fact, when Shiplett testified that he did not attend the orthopedic evaluation for which he was referred because of his inability to pay, the ALJ did not inquire further about the availability of any free or reduced-price clinics. R. 65–66. On the other hand, this single statement is the only evidence supporting Shiplett's claim that he was unable to afford further treatment. Although the evidence is thin that Shiplett could not afford further orthopedic treatment, the ALJ did not marshal adequate evidence to support this reason for faulting Shiplett's failure to have left ankle fusion surgery.

The ALJ's analysis of the objective evidence of Shiplett's impairments is also flawed in part. The ALJ determined that physical exams failed to show gait problems or significantly decreased

---

[6] Shiplett submitted records to the Appeals Council that show he injured his left shoulder in May 2014 and that the injury required surgery. As the ALJ issued his decision in February 2014, the subsequent injury to Shiplett's left shoulder does not constitute new evidence relevant or material to the claimed period of disability. At oral argument, Shiplett's counsel conceded that these records were not new evidence, and he argued that they showed further deterioration in Shiplett's condition leading to surgery. Such an argument is more properly considered through a new application for disability benefits.

12

range of motion, strength, or sensation in an extremity. R. 47. The record shows otherwise. Physical exams consistently showed that Shiplett had significantly decreased range of motion in the left ankle and that he walked with a limp, although a nerve conduction study revealed normal results. Treatment records contain scant information about his right shoulder, but at one exam Dr. Kennedy noted pain upon abduction and external rotation. Thus, the ALJ's observation is incorrect as to Shiplett's left ankle, but mostly accurate as to his right shoulder.

Despite the issues with the ALJ's reasoning outlined above, other factors provide ample support for the ALJ's determination that Shiplett was not fully credible as to the limiting effects of his symptoms. The ALJ noted that the most important evidence detracting from the credibility of Shiplett's claimed limitations was Shiplett's own description of his daily activities. R. 47. The ALJ specifically cited to the record, noting that the daily activities Shiplett reported in documents submitted to the state agency, R. 210–12, combined with his statements to Dr. Kennedy detailing time he spent doing house and yard work and painting fences were "not consistent with [Shiplett's] allegations of total debility." R. 47. Reviewing Dr. Kennedy's medical opinion that Shiplett could not complete a normal work week, the ALJ concluded that it deserved "no weight" because his opinion was inconsistent with Shiplett's report of activities that were attached to the opinion. He stated that the fact that, despite his reports of pain, Shiplett was able to complete these tasks "suggest[s] that he is not so physically limited that he cannot work at all as Dr. Kennedy claims in his opinion." *Id.*

The ALJ also cited Shiplett's testimony regarding his landscaping employment. R. 47. Shiplett testified at the hearing that he was able to complete landscaping work full time in the summer of 2013 and was still working approximately three days per week at the time of the hearing in January 2014. Although Shiplett stated that days of digging into hard ground caused him to stay home for a day to recover from shoulder pain, he also indicated that he did not require that recovery time on less physically demanding days, such as when he spread mulch. *Id.* The ALJ found that Shiplett's ability to perform landscaping work at this lighter level supported an RFC of light work.

He reasoned that the VE had classified Shiplett's landscaping work, including digging, at a medium level of exertion and spreading mulch was a lighter level of exertion. *Id.*; *see* R. 74. Shiplett argues that his report of limitations caused by his work was more nuanced. He could perform some light work, but it still left him debilitated and in pain. While this explanation could support a different interpretation, Shiplett's description of his work does not command only that conclusion, and I cannot find that the ALJ's factual findings on this issue were unreasonable. The ALJ could reasonably determine that activities such as these undermined Shiplett's statements of complete disability. *See, e.g.*, *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) (finding that daily activities including washing dishes, grocery shopping, and taking care of personal needs supported the ALJ's adverse credibility determination); *Hilton-Williams v. Barnhart*, No. 7:05cv674, 2006 WL 3099648, at *4 (W.D. Va. Oct. 24, 2006) (noting daily activities of cooking, cleaning, driving, grocery shopping, and watching television supported the ALJ's adverse credibility determination). Although the ALJ's credibility analysis contained some flaws, his reliance on Shiplett's statements about the activities that he could perform provide substantial evidence to support his decision to discount the severity of Shiplett's reported symptoms. This is not to say that the ALJ found that Shiplett did not experience pain. The ALJ instead found that Shiplett could perform work at a somewhat reduced light exertional level.

Having assessed the credibility of Shiplett's report of limitations, the ALJ relied upon Shiplett's work and other activities and Dr. Kadian's medical opinion of Shiplett's functional abilities to determine his RFC. They amply support the ALJ's RFC assessment. The ALJ accurately presented that RFC in a hypothetical to the VE, who testified that Shiplett would be able to perform other work. Accordingly, I find that substantial evidence supports the Commissioner's final decision that Shiplett does not meet the standard for disability.

14

IV. Conclusion

For the foregoing reasons, I find that substantial evidence supports the Commissioner's final decision. Accordingly, the Court will **GRANT** the Commissioner's motion for summary judgment, ECF No. 14, **AFFIRM** the Commissioner's final decision, and **DISMISS** this case from the Court's active docket. A separate Order will enter.

The Clerk shall send certified copies of this Memorandum Opinion to all counsel of record.

ENTER: September 12, 2016

Joel C. Hoppe
United States Magistrate Judge